**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:22-cv-00454-MR**

| | |
|---|---|
| **GERALD DAMONE HOPPER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **MEMORANDUM OF** |
| | )    **DECISION AND ORDER** |
| | ) |
| **GARRY L. MCFADDEN, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

**THIS MATTER** comes before the Court on Defendants' Motions for

Summary Judgment [Docs. 35, 56, 64, 66]; Defendant LeBliss's Motion for

Judgment on the Pleadings [Doc. 45]; Defendant McFadden's Motion to

Strike [Doc. 81]; and Plaintiff's Motion for Leave to File Surreply [Doc. 83].

**I.**    **PROCEDURAL BACKGROUND**

Pro se Plaintiff Gerald Damone Hopper ("Plaintiff") is a pretrial detaine

currently detained at the Robert A. Deyton Detention Facility in Love Joy,

Georgia.  Plaintiff filed an unverified Complaint in this matter on August 31,

2022, pursuant to 42 U.S.C. § 1983, while he was detained at the

Mecklenburg County Detention Center (the "Jail") in Charlotte, North

Carolina, asserting claims of deliberate indifference to a serious medical

need against Defendant Garry L. McFadden, Mecklenburg County Sheriff;

Mary LeBliss, Jail doctor; Destiny Walters, Jail physician's assistant; and Wellpath, the Jail medical provider. [Doc. 1]. Plaintiff's official capacity claim against Defendant McFadden and individual capacity claims against Defendants LeBliss and Walters passed initial review. [Doc. 8]. Plaintiff's remaining claims and Defendant Wellpath were dismissed for Plaintiff's failure to state a claim for relief. [Id.]. Plaintiff later filed an unverified Amended Complaint to add Roshaunda Friday, Jail nurse, as a Defendant, and Plaintiff's claim against her also passed initial review. [Docs. 11, 17]. Plaintiff alleges to have suffered severe pain and physical injury, emotional and mental distress and anguish, and post-traumatic stress disorder. [Doc. 11 at 5]. Plaintiff seeks compensatory and punitive damages and unidentified injunctive relief. [Id.].

Defendant Friday moved to dismiss Plaintiff's Complaint for failure to state claim upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. 31]. The Court denied this motion, finding that Plaintiff's "allegations, if true, are sufficient to state a facially plausible claim that Defendant Friday is liable for deliberate indifference to Plaintiff's serious medical needs[.]" [Doc. 61 at 8]. The Court also noted that it would "decline[ ] to dispose of a claim against one healthcare provider Defendant under the circumstances of this case before all potential

dispositive motions are ripe," in any event. [Id. at 9].

All Defendants have now moved for summary judgment.[1] [Docs. 35, 56, 64, 66]. In support of her motion, Defendants Walters submitted a memorandum, her Affidavit, and Plaintiff's medical record from the Jail. [Docs. 36, 36-1 to 36-2]. Defendant LeBliss submitted only a memorandum in support of her motion. [Doc. 57]. Defendant Friday submitted a memorandum, her Affidavit, and an Affidavit of Muhammed Wasi Haq, M.D., attesting to the propriety of Defendant Friday's care. [Docs. 65, 65-1 to 65-3]. Finally, Defendant McFadden submitted a memorandum; an Affidavit of Telisa White, Chief of Detention for the Mecklenburg County Sheriff's Office (MCSO); the MCSO Medical Plan; and documents reflecting approval of the Medical Plan by the MCSO and the Mecklenburg County Health Department. [Docs. 67, 67-2 to 67-5].

The Court entered several orders in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motions and of the manner in which evidence could be submitted to the Court. [Docs. 33, 59, 69]. Plaintiff responded separately to each of Defendants' summary judgment motions

---

[1] Defendant LeBliss also previously filed a motion for judgment on the pleadings [Doc. 45], which the Court will deny as moot.

Case 3:22-cv-00454-MR   Document 85   Filed 11/09/23   Page 3 of 24

with short statements made under penalty of perjury and a single page of a medical record from an October 11, 2022, follow up visit at the Jail. [Docs. 44, 62, 70, 71, 71-1]. Defendants replied [Docs. 42, 63, 73, 76], and Plaintiff filed unauthorized surreplies [Docs. 68, 78, 80]. Defendant McFadden moved to strike the surreply filed against him [Doc. 81] and, in response, Plaintiff moved for leave to file all his unauthorized surreplies [Doc. 83].

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

4

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.  Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record.  See id.; Fed. R. Civ. P. 56(c)(1)(a).  Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and construe all reasonable inferences and ambiguities against the movant and in favor of the nonmoving party. Wai Man Tom v. Hospitality Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020); see Anderson, 477 U.S. at 255.  Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  That is, "[w]hen the moving party has

carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986) (citation and internal quotation marks omitted).

"[I]n determining whether a prisoner has received adequate medical treatment, the federal court is entitled to rely on the physician's affidavit and prison medical records kept in the ordinary course of operation." Stokes v. Hurdle, 393 F. Supp. 757, 762-63 (4th Cir. 1975), affirmed, 535 F.2d 1250 (4th Cir. 1976) (citations omitted). "In short, if it appears from the record that the prison medical authorities have made a sincere and reasonable effort to handle the prisoner's medical problems, the constitutional requirements have been met." Id. at 763.

## III.   FACTUAL BACKGROUND

 The relevant forecast of evidence in the light most favorable to Plaintiff is as follows.

The MCSO contracts with Wellpath to provide medical care to Jail residents.  [Doc. 67-2 at ¶ 4: White Dec.].  On August 1, 2021, the MCSO implemented policies and procedures to provide medical care to Jail

residents called the Medical Plan. [Id. at ¶ 6]. The Medical Plan was developed in coordination with MCSO's Medical Provider, Wellpath, and Mecklenburg County's Public Health Director. [Id.]. The Medical Plan is designed to protect the health and welfare of the residents and to avoid the spread of contagious disease. [Id. at ¶ 8]. The Medical Plan, in part, provides for medical supervision of residents and emergency medical care to the extent necessary for the residents' health and welfare. [Id.].

Policy F-08 of the Medical Plan, which covers Verification and Accommodation of Disability, "is intended to ensure that patients with disabilities are identified and receive ongoing medically necessary accommodations[.]" [Doc. 67-3 at 332]. Under this policy, Jail residents are evaluated via the receiving screening and health assessment to identify disabilities requiring accommodation and the need for a "health care appliance," defined as "[a] device used to perform a therapeutic or correction function such as a … colostomy pouch[.]" [Id. at 332-33]. During the initial medical screening, the medical provider "shall confirm … prescription of health care appliances … and identify the patient's physical limitations." [Id. at 336]. Under the Medical Plan, when a resident is transferred from the Jail, they are provided a 14 days' supply of prescribed medical supplies, including colostomy supplies. [Id. at 355].

On April 11, 2022, Plaintiff was arrested and detained at the Jail. [Doc. 36-2 at 33]. The same day, Angela Wallace, Licensed Practical Nurse (LPN), performed a medical screening of Plaintiff. [See id. at 33-43]. LPN Wallace recorded the Plaintiff's vital signs and completed a questionnaire of Plaintiff's medical and socioemotional history. [See id. at 34-40]. LPN Wallace noted that Plaintiff's colostomy required "special accommodations" and that Plaintiff needed a medical referral. [Id. at 35, 42].

On April 12, 2022, Plaintiff was seen by LPN Wallace. [Doc. 36-2 at 145-46]. At this visit, LPN Wallace noted that Plaintiff's colostomy bag was present at his right abdominal area and that he needed colostomy care. The same day, an order was added for Plaintiff to receive a new colostomy bag once a week. Plaintiff received his first that day. [Id. at 145-46, 128]. The next day, Plaintiff was again seen by medical. Lisa Carelock, RN, noted that Plaintiff had a "midline abdominal surgical healed wound that is painful to touch because his staples are underneath the skin. The staples were not taken out and his skin now completely covers them." [Id. at 144]. Plaintiff requested something for pain and was prescribed Tylenol. [Id. at 144, 127]. Nurse Carelock noted that Plaintiff stated he had a colostomy reversal procedure scheduled for April 25, 2022, and Plaintiff was placed on the provider schedule to address his needs. [Id. at 144].

On April 14, 2022, Plaintiff was seen by Defendant Walters for complaints of chest pain. [Id. at 18; Doc. 36-1 at ¶5(a): Walters Aff.]. Defendant Walters noted the following in Plaintiff's medical record:

> Patient states he has this pain "all the time" and normally goes to the ED for care. During visit, patient has to be redirected numerous times to discuss acute chest pain. Patient spends majority of visit discussing this previous [gunshot wound (GSW)] and resulting ailments from this trauma. Patient states his GSW was about a year ago; states he was shot with a shotgun and remnants of bullet fragments are throughout his entire body. Patient reports chronic pain due to bullet fragments; was being seen by pain clinic but stopped due to not wanting narcotics.

[Id. at 18]. Plaintiff also reported having lost a kidney due to the GSW and that he suffered a deep vein thrombosis (DVT) while in the hospital for the GSW. [Id.]. Plaintiff admitted discontinuing his medications approximately six months previously against medical orders and expressed that he was not interested in restarting them. [Id.]. Defendant Walters recorded that Plaintiff was not "adherent to meds" and that his colostomy bag was "present on right lower abdomen." [Id. at 18, 20]. In the treatment plan for this visit, Defendant Walters recorded that she offered Plaintiff Tylenol as needed, but that he declined. Defendant Walters also wrote "[c]ontinue colostomy care." [Id. at 21; see Doc. 36-1 at ¶ 5(a)]. Two days later, Plaintiff was seen by Nurse Elce for "multiple complaints," none of which involved Plaintiff's colostomy

care.  [Id. at 142].   Nurse Else also offered Plaintiff Tylenol as needed and to restart his other medications, but he declined.  [Id.].

On April 20, 2022, Plaintiff was seen again by medical for an assessment of chest pain.  [Id. at 141].  At this visit, Plaintiff noted having pain in his epigastric region, which refers to the upper central part of the abdomen just below the rib cage.  Nurse Morris documented that Plaintiff's colostomy bag was intact on his right side with "[l]ight brown colored liquid in bag" and that the "[o]stomy site [was] pink and moist."  [Id.].  On April 27, 2022, Plaintiff submitted a sick call request, seeking information about his reversal surgery that had been scheduled for April 25 and  complaining about "excruciating pain" he suffers "from a severe DVT blood clot."  [Id. at 184].

On May 1, 2022, Plaintiff submitted a sick call request, again complaining of his missed surgery appointment.  [Id. at 181].  On May 3, 2022, Plaintiff was seen for a "chronic care" visit by Defendant LeBliss.  [Id. at 13].   At this visit, Plaintiff told Defendant LeBliss about his having an appointment for colostomy reversal.  Defendant LeBliss told the Plaintiff that he would "most likely have to wait [until] he gets out for that since it is not life threatening to have the reversal."  [Id.].   The Plaintiff expressed understanding.  [Id.].  Due to Plaintiff's complaints regarding a history of DVT, Defendant LeBliss ordered a venous doppler ultrasound of Plaintiff's left leg,

10

which was performed on May 16, 2022. [Id. at 47, 105]. The study showed no evidence of DVT. [Id. at 47]. On May 5, 2022, despite Defendant LeBliss having advised Plaintiff he would have to wait to have his colostomy reversed, he submitted another sick call request asking when his surgery would be rescheduled, stating "[i]t is long over due to be removed." [Id. at 180].

On May 16, 2022, after exhibiting multiple signs and symptoms of anxiety, Plaintiff underwent a mental health assessment. [Id. at 89, 72-79]. During this assessment, Plaintiff expressed that he was anxious about his kidney function "and is afraid to take anything that may make it worse." [Id. at 72]. As a result of this assessment, Plaintiff was referred to a psychiatric prescriber. [Id. at 78]. Two weeks later, Plaintiff underwent a psychiatric evaluation and was diagnosed with adjustment disorder with anxious mood and prescribed medication for anxiety and pain. [Id. at 80, 83].

On May 25, 2022, Plaintiff was seen by Defendant Friday for more complaints of chest pain. [Id. at 94]. Defendant Friday performed an examination of the Plaintiff. An EKG was done, which was reviewed by Defendant LeBliss, and Plaintiff was cleared to return to his pod. [Id.]. On June 8 and 9, 2022, Plaintiff submitted sick call requests asking for another colostomy bag. [Id. at 168-69]. On June 23, 2022, LPN Jones met with

Plaintiff in response to another sick call request. Plaintiff asked her about colostomy reversal. LPN Jones informed Plaintiff that reversal would not take place until Plaintiff either went to federal prison or was released because it was a "non emergency." [Id. at 166]. On June 24, 2022, Plaintiff submitted another sick call request for a colostomy bag, noting it had been nearly five days since he was last provided one. [Id. at 164].

On July 10, 2022, Plaintiff submitted a sick call request complaining about his "severe" DVT symptoms and claiming he had not received proper care for his condition. [Id. at 160]. On July 13, 2022, Defendant Walters ordered another venous doppler ultrasound of Plaintiff's lower right leg to rule out DVT. [Id. at 100; Doc. 36-1 at ¶ 5(b)]. The study was performed the next day, and no DVT was seen. [Id. at 90; Doc. 36-1 at ¶ 5(b)].

On July 27, 2022, Plaintiff was seen again by Defendant LeBliss for a chronic care visit. [Id. at 8]. In the record for this visit, the note from Plaintiff's May 3, 2022 visit, including the discussion regarding the colostomy reversal surgery, is duplicated verbatim.[2] [See id. at 8, 13]. Defendant LeBliss then discussed Plaintiff's diet concerns and request for a high protein diet to gain

---

[2] As such, it is not clear whether Plaintiff and Defendant LeBliss again discussed Plaintiff's colostomy reversal surgery during this visit.

weight.  [Id. at 8].  Defendant LeBliss noted that Plaintiff "has colostomy and well healed abd[ominal] scar."  [Id. at 10].

On August 10, 2022, Plaintiff submitted a sick call request complaining of "severe pain around [his] stoma area" and that he needed a colostomy bag.  [Id. at 153].  On August 16, 2022, Plaintiff submitted another sick call request complaining that he noticed "blood on the tissue" last night while changing his colostomy bag, that "there was blood exuding from the incising [*sic*] of the stoma," and that he was still experiencing pain.  [Id. at 152].  The next day, Plaintiff submitted another sick call request, restating his previous complaints about his stoma and that, "[i]t should be duly noted that pain is indicative that something is wrong."  [Id. at 151].  On August 30, 2022, Plaintiff had a psychiatric follow up visit where he again reported concern over "taking too many medications w/one kidney."  [Id. at 85].

On August 31, 2022, Plaintiff filed his Complaint in this matter.  [Doc. 1].  On September 6, 2022, Plaintiff submitted a sick call request asking for a colostomy bag.  [Id. at 150].  Two days later, Plaintiff submitted a sick call request complaining that the bag he was given was the wrong size and that he "had the same one on for nearly 12 days."  [Id. at 148].

On September 28, 2022, Plaintiff was seen by Defendant Friday with a complaint of bleeding around the stoma, which Plaintiff reported had never

happened before.  [Id. at 132].  Plaintiff also reported constant "10/10 left upper abdominal pain."  [Id.].  Through her training, education, and experience, Defendant Friday knows the signs of stoma infection, which include purulent drainage, warmth, redness, and pain.  [Doc. 65-2 at ¶ 8: Friday Aff.].  Defendant Friday allowed Plaintiff to remove the colostomy bag so she could assess the stoma.  [Doc. 36-2 at 132].  Defendant Friday inspected the area around Plaintiff's stoma and determined there were no signs of infection of the stoma or the skin around the stoma.  [Doc. 65-2 at ¶ 9].  She noted in Plaintiff's record that the "stoma is pink, no irritation around site, no drainage or redness, no [signs or symptoms] of infection."  [Doc. 36-2 at 132].  Plaintiff cleaned the area with gauze and normal saline. Defendant Friday noted in the medical record, "patient has very small traces of blood on gauze."  She explained to the Plaintiff that "the small amount of blood on the gauze does not indicate that there is a problem with the stoma and that stoma otherwise looks healthy."  [Id.].  The small amount of bleeding of the stoma did not indicate any acute issue because it could have been caused by something other than infection, such as the colostomy bag rubbing against the stoma.  [Doc. 65-2 at ¶ 11].

During this visit, Plaintiff complained about not receiving approval to undergo colostomy reversal surgery.  [Doc. 65-2 at ¶ 13].  As a registered

nurse, Defendant Friday is not authorized to issue referrals for outside procedures. [Id. at ¶ 14]. Defendant Friday spoke with Defendant Walters about getting Plaintiff a referral to be seen by a gastroenterologist and scheduled Plaintiff to be seen by a medical doctor at the Jail, presumably Defendant LeBliss.[3] [Doc. 36-2 at 132; Doc. 65-2 at ¶ 15].

On October 10, 2022, after multiple sick call requests related to ostomy care and supplies, Defendant Walters ordered that Plaintiff's supply be increased to "twice weekly on Tuesdays and Fridays" and that colostomy supplies may also be provided as needed "when excessively soiled." [Id. at 131; see Doc. 36-1 at ¶ 5(c)]. The next day, Plaintiff was seen by Defendant LeBliss for another chronic care visit. [Id. at 2]. Defendant LeBliss noted that Plaintiff was "upset today about him not able to have colostomy reversal, [Defendant LeBliss] told him most likely he has to wait till he gets out for that since it is not life threatening to have the reversal [and] also cosmetic and very costly." [Id. at 3]. Plaintiff became "agitated and agnry [*sic*]" after Defendant LeBliss denied Plaintiff's request for a diet supplement, causing Defendant LeBliss to cut the visit short. [Id.]. The next day, Nurse Practitioner Squibb ordered that Plaintiff be provided a new colostomy bag

---

[3] This visit with Defendant Friday is the basis for Plaintiff's claim against her in his Amended Complaint. [See Doc. 11].

three times per week and additionally as needed. [Id. at 102]. Plaintiff was housed at the Jail until October 25, 2022. [Doc. 67-2 at ¶ 4]. Throughout his detention at the Jail, Plaintiff frequently refused to take his prescribed medications. [See Doc. 36-2 at 51, 55, 58, 60, 63, 70-71]. Plaintiff underwent colostomy reversal surgery on December 15, 2022. [Doc. 47].

This matter is now ripe for disposition.

## IV. DISCUSSION

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment. [4] Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants

---

[4] Because the Plaintiff was a pre-trial detainee at the relevant times, his deliberate indifference claims are properly brought under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983). However, the Fourth Circuit has long applied the Eighth Amendment deliberate indifference standard to pretrial detainees' deliberate indifference claims. See Moss v. Harwood, 19 F.4th 614, 624 n.4 (4th Cir. 2021) (noting that, "under Kingsley v. Hendrickson, 576 U.S. 389, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), pretrial detainees bringing excessive force claims under the Fourteenth Amendment are no longer required to satisfy the analogous subjective component that governs the Eighth Amendment excessive force claims of convicted prisoners ... [however] the Supreme Court has not extended Kingsley beyond the excessive force context to deliberate indifference claims, ... and neither has our court...."); Mays v. Sprinkle, 992 F.3d 295, 300-02 (4th Cir. 2021) (declining to decide whether a pretrial detainee must satisfy the subjective component of the Eight Amendment deliberate indifference standard).

16

actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Mere delay in the provision of medical care, however, is not enough to state a deliberate indifference claim. "Rather '[t]he objective prong requires [the plaintiff] to show that the alleged delay … put him at a substantial risk of serious harm." Moskos v. Hardee, 24 F.4th 289, 298 (4th Cir. 2022) (quoting Moss v. Harwood, 19 F.4th 614, 624 (4th Cir. 2021)) (internal quotation omitted). "A commonplace medical delay such as that experienced in everyday life will only rarely suffice to constitute an Eighth Amendment violation, absent the unusual circumstances where the delay itself places the prisoner at 'substantial risk of serious harm,' such as where the prisoner's condition deteriorates markedly or the ailment is of an urgent nature." Id.; see also Formica v. Aylor, 739 F. App'x 745, 755 (4th Cir. 2018) (explaining that where a claim is based not on a denial of medical care, but a claim that

the care has been delayed, "we have ruled that there is no Eighth Amendment violation unless the delay results in some substantial harm to the patient, such as marked exacerbation of the prisoner's medical condition or frequent complaints of severe pain") (internal quotation marks omitted).

Moreover, allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). Further, the constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

Local governing bodies "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978); see Mt. Healthy City Sch. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977) (Eleventh Amendment immunity "does not extend to counties or similar municipal corporations."). Municipal liability under § 1983 arises only when the offensive acts are taken in furtherance of municipal policy or custom. Id.; see City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989) (a municipality can be liable under § 1983 only where its policies are the "moving force" behind the constitutional violation) (quoting Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981)).

There are three necessary elements for asserting Monell liability. First, the plaintiff must plausibly allege a constitutional harm that stems from the acts of a municipal employee "taken in furtherance of some municipal 'policy or custom.'" Milligan v. City of Newport News, 743 F.2d 227, 229 (4th Cir. 1984) (quoting Monell, 436 U.S. at 694); see also Spell v. McDaniel, 824 F.2d 1380, 1389 (4th Cir. 1987). Second, the plaintiff must allege facts showing that the policy's creation is fairly attributable to the

19

municipality. <u>Spell</u>, 824 F.2d at 1389. Third, the plaintiff must allege an affirmative causal link between the "policy or custom," and the particular injury suffered by the plaintiff. <u>Spell</u>, 824 F.2d at 1389.

To succeed on a, Eighth Amendment claim against Defendants LeBliss, Walters, and Friday, Plaintiff must show that these Defendants actually knew of and disregarded a substantial risk of serious injury to the Plaintiff or that they actually knew of and ignored Plaintiff's serious need for medical care. <u>Young</u>, 238 F.3d at 575-76. Mere disagreement between the Plaintiff and any Defendant over the Plaintiff's proper medical care does not support an Eighth Amendment claim. <u>See</u> <u>Wright</u>, 766 F.2d at 849. Nor does a delay in receiving care unless Plaintiff shows that such delay put him at a substantial risk of serious harm, such as a marked deterioration in his condition. <u>See</u> <u>Moskos</u>, 24 F.4th at 298.

Here, the forecast of evidence shows that there was some delay after Plaintiff's August 2022 sick call requests and his being seen by Defendant Friday on September 28, 2022. Between August 10 and 17, 2022, Plaintiff submitted three sick call requests complaining of pain around his stoma and that he noticed "blood on the tissue" and blood "exuding" from the stoma incision. He filed his Complaint in this matter on August 31, 2022, not having yet received care for these complaints. There is no forecast of evidence,

however, that any Defendant was aware of Plaintiff's sick call requests or had any involvement in the processing of sick call requests. Rather, the forecast of evidence shows that once Plaintiff was eventually seen regarding his concerns, Defendant Friday thoroughly considered Plaintiff's concerns and symptoms, examined his stoma, provided him with materials to clean it, and explained to him that the "small amount of blood on the gauze" was not problematic and that he showed no signs of infection. The forecast of evidence also shows that Plaintiff's complaint of pain at this visit involved his left upper abdomen and that his stoma was located on his right lower abdomen. Finally, the forecast of evidence shows that Plaintiff declined offers of pain medication while he was detained at the Jail and refused to take his medications due to his concerns over having only one kidney secondary to gunshot wounds. In this regard, while Plaintiff was concerned that the stoma pain was indicative of a problem, the forecast of evidence shows that there was no problem with Plaintiff's stoma, and he did not take issue with not having received pain medication during the delay. Even if Defendants had been aware of Plaintiff's complaints and requests for medical care during this time, the forecast of evidence does not show that the delay resulted in any deterioration in Plaintiff's condition or that his condition was objectively urgent or emergent.

Moreover, the forecast of evidence does not show any constitutional violation relative to the denial of colostomy reversal surgery during Plaintiff's detention at the Jail. The forecast of evidence shows that Plaintiff was scheduled to undergo colostomy reversal surgery on April 25, 2002, and that he was arrested and detained two weeks before that procedure was to take place. There is nothing in the forecast of evidence to suggest that the need for the procedure ever became urgent or emergent while Plaintiff was detained at the Jail, only that Plaintiff believed it was overdue and that he did not agree that the cost and nature of the procedure should be relevant considerations. That Defendants advised him that he would have to wait to undergo a non-emergent procedure until he was out of Jail or in federal custody is not deliberate indifference to a serious medical need. Moreover, Plaintiff attested that he underwent the procedure in December 2022, approximately two months after his release from Jail, presumably without incident, and he forecasted no evidence of any other issues arising from his being denied the surgery while in Jail. Had Plaintiff's condition changed and the need for the procedure become emergent, then a denial of colostomy reversal may have been deliberate indifference. But that was not the case. As such, from the forecast of evidence before the Court, there was no constitutional violation by Defendants LeBliss, Walters, or Friday relative to

the reversal surgery.

As such, the forecast of evidence on Plaintiff's claims against Defendants LeBliss, Walters, and Friday is insufficient to go to a jury on a § 1983 claim. Summary judgment is, therefore, appropriate.[5]

Because the forecast of evidence does not support a constitutional violation, Plaintiff's claim against Defendant McFadden, which is predicated on an unconstitutional custom or policy being the "moving force" behind a constitutional violation, necessarily fails. See Harris, 489 U.S. at 389; Milligan, 743 F.2d at 229.

## V.   PLAINTIFF'S SURREPLIES

Plaintiff filed unauthorized surreplies to the reply briefs of Defendants LeBliss, Friday, and McFadden. [See Docs. 68, 78, 80]. Defendant McFadden moved to strike Plaintiff's surreply to McFadden's reply brief, arguing that it violates Local Rule 7.1(e). [Doc. 81]. Plaintiff now moves for leave to file "the pending surreplies," asserting various grounds in support thereof. [Doc. 83]. Local Rule 7.1(e) provides that, "[s]urreplies are neither anticipated nor allowed by this Rule, but leave of Court may be sought to file a surreply when warranted." LCvR 7.1(e). Although Plaintiff's motion was

---

[5] Plaintiff's claim for injunctive relief is also moot and will be dismissed because Plaintiff is no longer confined at the Jail. Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007).

late, the Court will deny Defendant McFadden's motion to strike Plaintiff's surreply and grant Plaintiff's belated motion for leave to file his surreplies.

## V.   CONCLUSION

For all the foregoing reasons, the Court will grant Defendants' motions for summary judgment, deny Defendant LeBliss's motion for judgment on the pleadings as moot, deny Defendant McFadden's motion to strike, and grant Plaintiff's motion for leave to file his previously unauthorized surreplies.

## ORDER

**IT IS, THEREFORE, ORDERED** Defendants' Motions for Summary Judgment [Docs. 35, 56, 64, 66] are **GRANTED**; and this action is dismissed with prejudice.

**IT IS FURTHER ORDERED** that Defendant LeBliss's Motion for Judgment on the Pleadings [Doc. 45] is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Defendant McFadden's Motion to Strike [Doc. 81] is **DENIED** and Plaintiff's Motion for Leave to File Surreply [Doc. 83] is **GRANTED**.

The Clerk is respectfully instructed to terminate this action.

**IT IS SO ORDERED.**

Signed: November 8, 2023

Martin Reidinger
Chief United States District Judge